IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                                        CRIMINAL ACTION NO. 3:19-00153-01

STEVEN DALE McCALLISTER

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Steven Dale McCallister's Motion to Dismiss Indictment for Violation of Speedy Trial Rights and Prosecutorial Misconduct. ECF No. 144. For the following reasons, the Court **DENIES** the motion.

**I.**
**FACTUAL AND**
**PROCEDURAL BACKGROUND**

Steven McCallister and his romantic partner Paige Coffman [1] lived with Defendant's father, Larry McCallister,[2] in Larry's house located in Barboursville, West Virginia. On June 12, 2019, agents with the Metropolitan Drug Enforcement Team debriefed a confidential informant (CI) who said he was purchasing fentanyl and heroin from Steven in the Barboursville area. The agents arranged for the CI to make a controlled purchase of 50 grams of heroin from Steven at the residence that same day.

---

[1] According to the United States, Ms. Coffman overdosed and died in April of 2020.

[2] Larry McCallister died on November 26, 2020.

Prior to the purchase, agents equipped the CI with two recording devices. The first was an audio/visual recording device to record the transaction. The second device allowed agents to watch the purchase in real time to monitor the CI's safety. The real-time device worked through an application on a cellphone, and agents historically have been unable to download videos from it.

In relevant part, the audio/video recording made with the first device depicts the CI knocking and announcing his presence at Larry McCallister's door. Larry opens the door, and Steven is in the living room. The CI and Steven eventually go to the basement, where Steven's bedroom is located. Once there, the CI provides Steven with prerecorded buy money. The two then return upstairs to the kitchen, and the CI receives 50 grams of heroin. During this time, Larry's voice can be heard, seemingly from another room. After receiving the heroin, the CI leaves.

On the same day as the controlled buy, the agents obtained and executed a search warrant for the residence. During the search, Larry was seated on a couch in the living room. He stayed there during the entire search. Steven and Ms. Coffman also were present. In Steven's bedroom, agents found fentanyl and a nearby loaded Smith and Wesson, Model 686, .357 magnum revolver. Agents also found the prerecorded buy money on the bed and $4,040 additional cash in the bedroom. On the main floor, agents discovered a bread machine in a spare bedroom where cat supplies were kept. Hidden inside the bread machine was over a kilogram of fentanyl. Agents also located over 300 grams of methamphetamine hidden in a dresser drawer in Larry's bedroom.

During the search, the agents interviewed Ms. Coffman. She said she saw Steven with large quantities of cash, was unaware of any employment he had, and suspected he sold fentanyl, but she never personally witnessed a sale. She said she believed Steven did the transactions in his bedroom so she would not see them. She told the agents that Steven regularly supplied her with fentanyl to keep her from getting sick. She also reported that Larry, who was a retired police officer, often kept a firearm in plain sight in the common areas of the house.

Detective Wesley Daniels, who knew Larry was a retired police officer, conducted a recorded interview with him. During the interview, Larry said he did not know anything about the methamphetamine found in his bedroom. Detective Daniels indicated he did not believe the methamphetamine belonged to him, but he wanted Larry to tell him what Steven was doing. Larry stated he was suspicious of his son, but he never witnessed him selling drugs from the house. Detective Daniels told Larry that he likely would go to federal prison if he did not help them with the investigation. The agents and Larry then had the following exchange:

| | |
|---|---|
| **Officer:** | You got, you got quite a few years on your [sic], sir. You know what I'm saying? We're not trying to put you in prison for the rest of your life, but I promise you that amount of dope, if you go to prison for this, you will die in prison. |
| **Larry McCallister:** | I die in there, no doubt that I will die in there. |
| **Officer:** | I don't want to do that shit because you ain't out here selling this stuff. I know you. |
| **Larry McCallister:** | I don't. I wouldn't think- I wouldn't think Steven would send me back to the penitentiary. |
| **Officer:** | Listen, we're going to need a level of cooperation or that's where you're going. |

-3-

> Without a doubt. You're going to have to tell
> us what you know because I know you know.

*Mot. to Dis. Indict. for Prosec. Misconduct by Larry McCallister*, ECF No. 109, at 5 (footnote omitted; quoting Ex. 1, Recording of June 12, 2019 interview of Larry McCallister).[3] Despite the threat of imprisonment, Larry maintained he never saw his son deal drugs at the house. At a later point, an officer can be heard telling Larry "'we're just not trying to do you dirty, you know what I'm saying?'" *Id*. (citing Ex. 1, at 10:00).

After the interview with Larry, Detective Daniels spoke with Steven in a recorded conversation. Detective Daniels began by telling Steven, "'I'm gonna give you this one chance to do your old man a solid and do right, but that's up to you.'" *Id*. (quoting Ex. 2, at 0:05, Recording of June 12, 2019 interview with Steven McCallister). When asked about the methamphetamine found in Larry's bedroom, Steven said it was not his father's drugs. *Id*. (citing Ex. 2, at 1:08. Detective Daniels responded saying "'oh, okay, well we'll go with that, but I'm telling you right now, you're going to put your old man in prison for a long time, and he's probably going to end up dying in prison.'" *Id*. (quoting Ex. 2, at 1:15). The conversation continues with Steven saying the drugs are not his father's, and Detective Daniel's repeating that Steven will end up putting his father in prison.

On June 18, 2019, Steven was charged with drug and firearm offenses as a single defendant in a four-count indictment. A jury trial was scheduled for September 4, 2019. On August

---

[3]Defendant incorporates Larry McCallister's motion by reference in his motion. *Def. Steven McCallister's Mot. to Dismiss Indict. for Violations of Speedy Trial Rights and Prosec. Misconduct*, at 2 ¶1.

14, 2019, a superseding indictment was returned adding Larry McCallister as a codefendant. Larry was charged with one count of maintaining a drug-involved premises and one count of aiding and abetting Steven with possession with intent to distribute 50 grams or more of a mixture of methamphetamine. ECF No. 21. A jury trial was set on the superseding indictment for both defendants for October 22, 2019. On September 23, Larry McCallister asked for a continuance of the trial date to allow additional time to investigate, and Steven McCallister filed a motion to suppress the evidence seized based upon an argument that the warrant was unconstitutional. The Court granted the motion to continue and reset the trial date for December 17, 2019, finding the time between October 22 and December 17 excludable. ECF No. 51. A pretrial hearing was set for December 2.

On November 26, the United States and Steven McCallister filed a joint motion to continue in anticipation of a plea agreement. *Joint Mot. of the United States and Def. Steven McCallister to Cont.*, ECF No. 60. The Government represented that Larry McCallister did not object to the continuance. *Id*. The Court held a hearing on the motion on December 2. Following the hearing, the Court entered an Order granting the motion and reset the pretrial motion hearing for January 7, 2020 and the trial for February 25, 2020. *Order*, ECF No. 65. The Court also found the time between December 19, 2019, and February 25, 2020 excludable. *Id*.

On January 7, 2020, the Court held a hearing and denied a Motion to Suppress filed by Steven.[4] Thereafter, on February 4, 2020, a second superseding indictment was returned against Larry and Steven. ECF No. 77. The second superseding indictment added a new count

---

[4]The Motion to Suppress was filed on September 23, 2019.

naming both men in a conspiracy to distribute 400 grams or more of a mixture or substance containing fentanyl, 50 grams or more of a mixture or substance containing methamphetamine, and a quantity of heroin. It also dropped the aiding and abetting count against both men, but it charged Steven with possessing with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine. The arraignment orders entered on February 11, 2020 scheduled the trial to begin on April 21, 2020. A week later, the Court held an *ex parte* hearing with Steven and his counsel regarding counsel's continued representation. For reasons discussed at the hearing, the Court relieved counsel of his representation and appointed new counsel.

Before a trial could be held in this case, the COVID-19 pandemic caused a continuance of all trials in this District. *See General Orders in Re: Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic*, 2:20-mc-00052 (Mar. 13, 2020; Mar. 23, 2020; Apr. 14, 2020; May 22, 2020; June 25, 2020). Therefore, on March 24, 2020, this Court entered an order resetting the trial in this case to begin on June 2. ECF No. 100. On May 12, Steven's new counsel filed an unopposed motion to continue for additional time to review discovery and review a plea deal offered. ECF No. 102. The Court granted the motion and reset the pretrial motions hearing for August 3 and trial for August 18. ECF No. 104.[5]

---

[5]Pursuant to the General Order entered on June 25, 2020, criminal trials were permitted to resume on July 1, 2020. *Gen. Order #7*, 2:20-mc-00052 (June 25, 2020). Due to an increase in COVID-19 cases, all trials in this District again were continued as of September 21, 2020, and they have not resumed. *Gen. Order #9*, 2:20-mc-00052 (Sept. 18, 2020).

Prior to the pretrial motions hearing,[6] the parties filed several motions. Larry filed a Motion to Dismiss Indictment for Prosecutorial Misconduct (ECF No. 109),[7] the United States filed a Motion in Limine to exclude certain evidence and arguments by counsel (ECF No. 114), and Steven filed two more Motions to Suppress. ECF Nos. 122, 123. On July 24 and 27, the United States responded to the defendants' motions and asked that they be denied. ECF Nos. 119, 125, 126. Nevertheless, on July 27, the United States also filed a Notice of Dismissal pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure of Count One for conspiracy; Count Four for possession with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine; and Count Five for maintaining a drug involved premises. ECF No. 127. The Court granted the dismissal (ECF No. 128), which resulted in no remaining charges against Larry and only Count Two for distribution of fentanyl, Count Three for possession with intent to distribute 400 grams or more of a mixture or substance containing fentanyl, Count Six for possession of firearm in furtherance of drug trafficking, and Count Seven for being a felon in possession of a firearm pending against Steven.[8]  Following the pretrial motions hearing, the Court entered a Memorandum Opinion and Order denying both of Steven's Motions to Suppress. ECF No. 134.

---

[6]By Order entered on July 22, 2020, the pretrial motion hearing date was reset for August 3, 2020. ECF No. 115.

[7]Counsel for Larry also filed a Motion for Discovery [of] *Brady* and *Giglio* Materials. ECF No. 108. The United States responded stating it recognized its continued obligation to provide such material. ECF No. 120.

[8]As Larry McCallister was dismissed from the case, the United States informed the Court that it did not intend to pursue its Motion in Limine so the Court denied the same as moot. ECF No. 130.

On August 16, 2020, Steven filed the pending Motion to Dismiss Indictment for Violation of Speedy Trial Rights and Prosecutorial Misconduct and a Motion to Continue Trial. ECF Nos. 144, 145. The United States quickly responded to the motions, and the Court entered an Order on August 17, denying a continuance and holding in abeyance the Motion to Dismiss. ECF No. 147. The case proceeded to jury trial on August 18 and 19, and Defendant was found guilty on all counts. Following the trial, Steven filed his Reply to the pending motion. ECF No. 180.

In the pending motion, Steven piggybacks his arguments off his father's Motion to Dismiss. The Court never ruled on Larry's motion because all the charges were dismissed against him just days after his motion was filed and one day after United States filed its Response. Nevertheless, Steven asserts the arguments made by his father demonstrate Larry was never a serious suspect in this case, and the motion presents prima facie evidence that there were knowing misrepresentations made to the grand jury and that the two superseding indictments were not objectively reasonable or founded in good faith. Steven claims that, but for these wrongful superseding indictments, he would have timely proceeded to trial. Instead, he asserts, as both superseding indictments were conceived and presented in bad faith, his trial was significantly delayed in violation of 18 U.S.C. § 3161 and The Speedy Trial Act of 1974. As a result, Steven seeks dismissal of all charges with prejudice.

In support of his motion, Steven incorporates his father's motion and points to Detective Daniels' grand jury testimony. Detective Daniels testified before the grand jury on three occasions. The first occasion was in June 2019, which ended with the first indictment solely against Steven. The second occasion was August 13, 2019, which resulted in both Steven and his father

being indicted. The third occasion was on February 4, 2020, which resulted in the second superseding indictment against both Steven and Larry. Steven contends that Detective Daniels' testimony changed on each occasion and that he blatantly misrepresented facts to implicate Larry to gain leverage over Steven. Steven insists these superseding indictments resulted in needless and countless delays and violated his speedy trial rights.

In his motion, Larry argued there was insufficient evidence to support any charge he conspired with his son to distribute drugs or knowingly and intentionally allowed his house to be used for storing, distributing, and using controlled substances. In addition, Larry asserted there are several instances in which Detective Daniels testified falsely and mislead the grand jury. Larry pointed to four specific pieces of Detective Daniels' testimony in support of his position.

When Detective Daniels testified before the grand jury on February 4, 2020, resulting in the second superseding indictment, he recounted that Larry opened the door for the CI and let him inside. According to Detective Daniels' testimony, Larry sat on a couch while the CI and Steven walked around the house talking loudly, almost yelling, about buying fentanyl. Detective Daniels indicated the CI and Steven were close to Larry when the fentanyl was weighed. Additionally, Detective Daniels said that when officers executed the search warrant, there were other drug customers there who told officers they obtained drugs from Steven at the residence numerous times. Detective Daniels also told the grand jurors that, although Steven had no lawful occupation, he bought a Cadillac, which Detective Daniels believed was purchased with drug proceeds. Detective Daniels testified he had no doubt Larry, based upon his law enforcement background, knew what Steven was doing in the house under the circumstances. He also stated

there was no indication Larry took any steps to revoke any agreement or permission he gave Steven to store and sell drugs from the residence.

In his motion, Larry argued Detective Daniels' testimony is contradicted by the video recording of the event. First, the video clearly shows Larry was never seated on the couch and, in fact, after he opened the door for the CI, he was nowhere in sight. During this time, the CI and Steven are using coded language to discuss drugs. Eventually, they go to the kitchen area, but Larry cannot be seen. At one point while the CI and Steven are in the kitchen, Larry's voice can be heard, but he appears to be telling either a dog or a cat to get out of his chair. After Larry's voice is heard, the CI and Steven begin to whisper and they go downstairs to the basement, while Larry seems to remain in the living room area. Importantly, Larry states he has serious physical limitations that require chair lifts to go up and down the stairs in the house and he wears hearing aids. Larry alleges that Detective Daniels was aware of both these facts.

Once in the basement, the CI and Steven start speaking loudly again about the "50" the CI wants to buy. The two then walk back upstairs to the kitchen area, and it appears that Steven gets fentanyl from another location in the house, returns to the kitchen, and gives it to the CI. There is nothing on the video showing that Larry was next to where the drugs were weighed and, in fact, the video does not show Steven weighing out the drugs.

Additionally, Larry complains that in Detective Daniels' August 13, 2019 grand jury testimony, he testified that Larry permitted his house "to be used not only to store drugs and distribute drugs, but to use drugs as well based upon the information provided to [him] by Ms.

[Coffman]." Ex. 4, GJ Tr. 13:13-18, Aug. 13, 2019, ECF No. 110-2. However, Larry asserts Ms. Coffman never made such a statement during her twenty-nine-minute recorded interview. In fact, Larry points out that Ms. Coffman said drug transactions "were not out in the open," "nothing was done in front of [her]," and she knew what a drug house was, and Larry's house was not one. *Mot. to Dis. Indict. for Prosec. Misconduct by Larry McCallister*, 3:19-00153, at 13 (quoting Ex. 3, at the 4:50, 7:50, and 12:00 marks) (internal quotation marks omitted). Thus, contrary to Detective Daniels' testimony, Larry insisted it was obvious Steven hid his drug transactions from him and Ms. Coffman's testimony undermines Detective Daniels' testimony that he allowed his house "to be used not only to store drugs and distribute drugs, but to use drugs as well[.]" Ex. 4, GJ Tr. 13:14-15.

        In its Response to Larry's motion, the United States represented that the agents were provided updated technology which enabled them to successfully download the video from the real-time recording device for the first time on July 21, 2019. In the original buy video, there is a brief clip of someone seated in the living room. Detective Daniels thought the individual was Larry. However, after reviewing the real-time video, the United States concedes Detective Daniels' was mistaken because the real-time video confirms it actually was Steven. Nevertheless, the United States maintains Detective Daniels believed his testimony to be true when he testified, and he did not deliberately provide the grand jury false testimony. In fact, the United States represents that Detective Daniels contacted its office after he learned of his mistake and reported it. Additionally, the United States asserts that, contrary to Steven's assertion there was no recording of him weighing the fentanyl, the real-time video shows the drugs being weighed in the kitchen and it also recorded Larry's voice coming from the direction of the adjacent living room.

Although the United States admits Detective Daniels' error about Larry being seated on the couch, it argues there was substantial other evidence to support the indictments. Specifically, the United States mentions:

- At the time of Steven's prior arrest in November 2014 for possession of heroin at 224 Carper Lane, Larry McCallister stated that he suspected Steven was dealing drugs. (2/4/2020 Tr. at 20);

- Larry McCallister answered the door for the CI and was in the house during the controlled buy. (2/4/2020 Tr. at 21);

- Agents located over 300 grams of methamphetamine in Larry McCallister's bedroom dresser during the search (2/4/2020 Tr. at 13);

- Agents located additional amounts of methamphetamine in the kitchen during the search. (2/4/2020 Tr. at 14);

- Agents located digital scales in the kitchen. (2/4/2020 Tr. at 14);

- Larry McCallister is a former police office which led the case agent to believe Larry McCallister would have known what was going on in his home. (2/4/2020 Tr. at 22-23).

*United States Resp. to Def. Larry McCallister's Mot. to Dismiss*, at 13, ECF No. 119 (footnote omitted). In light of this evidence, the United States contends Detective Daniels' mistaken testimony about Larry being seated on the couch during the controlled buy did not substantially influence the grand jury's decision to indict him, nor does it cast grave doubts over whether the decision to indict was free from substantial and improper influence.

The United States also disputes Larry's argument that he essentially could not have heard the CI and Steven during the course of the buy. The United States contends the CI and Steven are basically yelling at one another, which includes the CI telling Steven he wants "50 grams"

while they are in the kitchen. They also spoke loudly while Steven was weighing the drugs, and Larry's voice can be heard on the recording coming from the direction of the living room. Thus, the United States asserts it only stands to reason that, if Larry was close enough for his voice to be recorded while the CI was in the kitchen, then Larry would have heard Steven and the CI discussing the deal. Moreover, there was nothing improper about Detective Daniels describing to the grand jury his impression of how loud the conversation was.

Lastly, the United States responded to Larry's argument that Detective Daniels gave false testimony to the grand jury on August 13, 2019, about drugs being stored, distributed, and used at the house based upon Ms. Coffman's statement. As a result, the grand jury returned the first superseding indictment which added, in part, a charge against Larry that he maintained a drug involved premises. However, instead of defending the validity of Detective Daniels' testimony, the United States argued the testimony did not matter because Detective Daniels did not offer that same testimony when he testified before an entirely new grand jury on February 4, 2020. Nonetheless, the new grand jury still found sufficient evidence to indict Larry on the same charge in the second superseding indictment it returned. With respect to Steven's arguments, however, he insists all the charges against his father in both the first and second superseding indictment are specious, and the resulting delays violated his right to a speedy trial.

## II.
## DISCUSSION

Generally speaking, the Speedy Trial Act requires, in relevant part, a defendant's trial to "commence within seventy days . . . from the date the defendant has appeared before a judicial officer of the court in which such charge is pending." 18 U.S.C. § 3161(c)(1). As the Supreme Court explained in *Zedner v. United States*, 547 U.S. 489 (2006), the Speedy Trial Act

exists to protect both "a defendant's right to a speedy trial" and "the public interest." 547 U.S. at 501. However, the Supreme Court recognized the statute does not create an uncompromising mandate, and it is a flexible law given "that criminal cases vary widely and that there are valid reasons for greater delay in particular cases." *Id*. at 497. To that end, the Speedy Trial Act sets forth a list of excludable delays from the seventy-day clock. *See* 18 U.S.C. § 3161(h). Included within this list is "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6).

Defendant, however, does not contend his speedy trial rights were violated based on a miscalculation of the number of excludable days if the superseding and second superseding indictments withstand his challenge. Instead, he argues those indictments were improper and, therefore, his speedy trial calculations should be based solely on the first indictment. In other words, Defendant argues the extensions triggered by the subsequent indictments violated his right to a speedy trial on the charges contained in the original indictment.

In reviewing grand jury proceedings, the Court is mindful that they are cloaked in a presumption of regularity and judicial review of such proceedings is extremely limited. *See United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in judgment) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process."); *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 300 (1991) ("We begin by reiterating that the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its

-14-

authority."). The Supreme Court also has recognized that the grand jury is traditionally considered an independent body and is not restricted by the technical rules of evidence and procedure. *United States v. Calandra*, 414 U.S. 338, 344-45 (1974) ("The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered."). As such, judicial review is narrowly circumscribed, and courts have been reluctant to interfere with grand juries. Nevertheless, indictments have been dismissed when they are based on extreme and aggravated grand jury misconduct, either on due process grounds or as an exercise of their supervisory powers. *See, e.g., United States v. Kennedy*, 564 F.2d 1329, 1338 (9th Cir. 1977) (holding that "only in a flagrant case, and perhaps only where knowing perjury, relating to a material matter, has been presented to the grand jury should the trial judge dismiss an otherwise valid indictment returned by an apparently unbiased grand jury"); *but see United States v. Lee*, 906 F.2d 117, 120 (4th Cir. 1990) (per curiam) ("[A]s the Supreme Court has explained, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.").

It is a defendant's burden to overcome the presumption of regularity of grand jury proceedings. *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) (stating "Defendants alleging grand jury abuse bear the burden of rebutting the 'presumption of regularity attache[d] to a grand jury's proceeding'" (citation omitted)). In meeting this burden, a defendant must prove that (1) the violation constituted grave misconduct that "substantially influenced the grand jury's decision to indict" or creates "'grave doubt' that the decision to indict was free from the substantial influence of such violations," and (2) the defendant experienced actually prejudice. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (citations omitted); *United States v. Feurtado*,

191 F.3d 420, 424 (4th Cir. 1999) (citing the standard set forth in *Bank of Nova Scotia*).

Additionally, a court can exercise its supervisory power and dismiss an indictment for "misconduct

before the grand jury, at least where that misconduct amounts to a violation of one of those few,

clear rules which were carefully drafted and approved by [the Supreme] Court and by Congress to

ensure the integrity of the grand jury's functions." *United States v. Williams*, 504 U.S. 36, 46-47

(1992) (internal quotation marks and citations omitted) (holding, however, that federal courts

cannot prescribe the "standards for prosecutorial conduct in the first instance"). Nevertheless, an

indictment cannot be dismissed simply because it is based upon inadequate or incompetent

evidence. *See Costello v. United States*, 350 U.S. 359, 363 (1956) (holding "[a]n indictment

returned by a legally constituted and unbiased grand jury . . ., if valid on its face, is enough to call

for trial of the charge on the merits").


        Applying these standards to the present case, the Court initially looks to the first

superseding indictment and the grand jury testimony in support of that indictment. As previously

mentioned, the first superseding indictment added Larry as a defendant charging him, in part, with

maintaining a drug involved premises, in violation of 21 U.S.C. § 856(a)(2), and the aiding and

abetting in the possession with intent to distribute 50 grams or more of a mixture or substance

containing methamphetamine, in violation of 21 US.C. § 841(a)(1) and 18 U.S.C. § 2.[9]  In relevant

part, § 856(a)(2) provides that "it shall be unlawful to . . . (2) manage or control any place . . .

either as an owner . . . [or] occupant . . ., and knowingly and intentionally . . . make available for

---

[9]The first superseding indictment also added a charge against Steven for distribution of
fentanyl in violation of 21 U.S.C. § 841(a)(1).

use, with or without compensation, the place for the purpose of unlawfully . . . storing, distributing, or using a controlled substance." 21 U.S.C. § 856(a)(2), in part.

       In support of this charge, Detective Daniels testified at the August 13, 2019 grand jury proceedings that Larry owned the house where the drug transaction took place and that Larry let the CI inside the residence, and then sat on the couch in the living room. Detective Daniels indicated the CI and Steven were talking so loudly in the kitchen about the drug deal that he believed Larry could overhear what was being said. When the house was searched following the buy, Detective Daniels testified that over 300 grams of methamphetamine was found in a dresser drawer in Larry's bedroom. In addition, a Sig Sauer 9 mm pistol, which was the firearm Larry used as a police officer, was located in one of the dresser drawers. Detective Daniels thought the firearm was discovered directly across from the methamphetamine. Detective Daniels further testified that Steven had a criminal history, which included a March 10, 2015 federal conviction for possession with intent to distribute, and that he had no lawful occupation, but he had paid cash for a 2007 Cadillac, which he titled in Larry's name. Detective Daniels explained it was a common practice for drug dealers to title property in other people's names when they have no legitimate source of income. Detective Daniels also said Ms. Coffman, who basically was Steven's live-in girlfriend, had an opioid addiction and she told officers that Steven provided drugs to her daily to keep her from getting sick. Although Detective Daniels testified that he thought Steven was the drug dealer, he believed Larry permitted Steven to store and distribute the drugs from his house.

       In his motion, Larry asserted Detective Daniels mispresented certain facts and failed to mention incongruent facts to the grand jury. Specifically, Larry claimed that, contrary to

Detective Daniels' testimony, he was not seated on the couch in the living room when Steven and the CI were talking in the kitchen. In fact, Larry insisted he was nowhere in sight during the drug buy. Additionally, Larry maintained Detective Daniels knew he wears hearing aids, but he did not mention it in his testimony. Larry admitted that his voice can be heard on the recording at one point, but the CI and Steven's voices then get noticeably quieter and they went to the basement area.

Upon review, the Court finds Detective Daniels' mistaken testimony about Larry being seated on the couch was not a flagrant, extreme, or aggravated instance of grand jury misconduct that resulted in a wrongful indictment warranting this Court's interference. Even if this Court shall assume for argument's sake that Larry was not close enough to the CI and Steven to overhear their entire conversation in light of his hearing loss, Detective Daniels' testimony and failure to mention that Larry wore hearing aids did not so taint the grand jury's proceedings to erode probable cause. In fact, the Court finds there was more than sufficient other evidence presented to the grand jury, which has not been challenged, supporting the first superseding indictment against Larry for maintaining a drug involved premises and the aiding and abetting charge. Specifically, Larry had opened the door and remained in the house; there was a significant amount of methamphetamine found in Larry's bedroom dresser drawer and Larry's service revolver was kept in the dresser; Steven had a prior drug conviction; Ms. Coffman was a drug addict who lived in the house and told Detective Daniels she received drugs from Steven on a daily basis; and, although Steven had no employment, he paid cash for a Cadillac and titled it in Larry's name. Given this extensive testimony, the grand jury easily could have believed Larry knew about his Steven's drug activity and knowingly and intentionally made his house available for Steven to

unlawfully store, distribute, and use controlled substances in violation of § 856(a)(2) and aided and abetted him in the possession with intent to distribute 50 grams or more of methamphetamine. Therefore, the Court finds the inaccuracy of this portion of the testimony is insufficient for Steven to meet his high burden to overcome the presumption of regularity of grand jury proceedings as to the first superseding indictment. *See Alvarado*, 840 F.3d at 189.

Larry also complained, however, that Detective Daniels inaccurately answered in the affirmative before the grand jury when he was asked the following by an Assistant United States Attorney: "And again, based upon your investigation, [Larry] was allowing that home to be used not only to store drugs and distribute drugs, but to use drugs as well based upon the information provided to you by Ms. [Coffman]. Is that correct?" Ex. 4, GJ Tr. 13:13-18, Aug. 13, 2019, ECF No. 110-2. Although Detective Daniels responded it was correct, Larry asserted Ms. Coffman never made such a statement during her twenty-nine-minute recorded interview. In fact, Larry maintained that Ms. Coffman said drug transactions "were not out in the open," "nothing was done in front of [her]," and she knew what a drug house was, and Larry's house was not one. *Mot. to Dis. Indict. for Prosec. Misconduct by Larry McCallister*, 3:19-00153, at 13 (quoting Ex. 3, at the 4:50, 7:50, and 12:00 marks) (internal quotation marks omitted). Thus, contrary to Detective Daniels' testimony, Larry insisted it was obvious Steven hid his drug transactions from him. However, the Court finds Larry's argument misconstrues what the Assistant United States Attorney said. Detective Daniels did not agree that Larry allowed Steven to store, distribute, and use drugs at the house based *solely* on information obtained from Ms. Coffman. Rather, it was "based upon [his] investigation" which included, but went well beyond, the information Ms. Coffman gave him. Moreover, she admitted receiving and using drugs on a daily basis at the house.

-19-

Even if Ms. Coffman said she did not believe the house was a drug house and she did not see Steven openly deal drugs, Detective Daniels was entitled to tell the grand jury about his conclusions without prefacing those conclusions with Ms. Coffman's impressions of the situation. As stated above, there was more than sufficient evidence to support the charges against Larry based upon other evidence derived from the investigation.

On February 4, 2020, Detective Daniels testified before a different grand jury which returned the second superseding indictment adding a new charge against both Steven and Larry of conspiracy to distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and a quantity of heroin pursuant to 21 U.S.C. § 846, from November 2014 to on or about June 12, 2019. The second superseding indictment also dropped the aiding and abetting charge, but it charged Steven with possession with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine. When he testified, Detective Daniels recounted much of his previous testimony, including the same mistaken testimony about Larry sitting on the couch. Additionally, Detective Daniels stated it was possible that Steven hid the drugs in Larry's dresser and that Larry told the officers he did not know the drugs were there. Detective Daniels also reiterated that Larry said he was suspicious of his son, but he could not confirm he was selling drugs.

Despite the mistake about where Larry was seated and the fact the officer said it was possible Steven hid some of the drugs in Larry's room without Larry's knowledge, the Court finds Steven has failed to show there was grave misconduct or grave doubt with respect to the

grand jury's decision to return the second superseding indictment adding the conspiracy charge. The new grand jury heard that Larry owned the house, Larry let the CI enter, there were drugs and scales in the kitchen (a common area), and there were other drug customers at the residence when the search warrant was executed, who said they had obtained drugs at the residence on numerous occasions. Detective Daniels further told the grand jury he had no doubt Larry knew about the drug transactions based upon Larry's experience as a police officer and all the things he saw. Given the totality of the evidence presented, the Court finds nothing that casts doubt on the grand jury's decision to return the second superseding indictment.

## III.
## CONCLUSION

Accordingly, the Court finds Steven has failed to meet his burden to overcome the presumption of the regularity of the grand jury proceedings, and the Court concludes that both the first and second superseding indictments were properly returned. As Steven's challenge rests solely on the legitimacy of those indictments and he does not contend a violation of his speedy trial rights if those indictments withstand his challenge (and, indeed, the Court finds no such violation), the Court **DENIES** Steven's Motion to Dismiss Indictment for Violation of Speedy Trial Rights and Prosecutorial Misconduct. ECF No. 144.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:          January 8, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

-21-